**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                              :
GWENDOLYN ANDERSON,              :      CIVIL ACTION
                      Plaintiff,         :
                                              :
   vs.                                     :      NO. 13-1986
                                              :
LEHIGH VALLEY HOSPITAL,          :
                      Defendant.        :
_____:

Henry S. Perkin, M.J.                                           March 30, 2015

<u>**MEMORANDUM**</u>

This matter is before the Court on Defendant Lehigh Valley Hospital's Motion for

Summary Judgment filed on August 8, 2014.  Plaintiff's Response in Opposition to Defendant's

Motion for Summary Judgment was filed on August 29, 2014.  Defendant's Reply Memorandum

in Support of the Motion for Summary Judgment was filed on September 9, 2014.   Having

reviewed and considered the contentions of the parties, the Court is prepared to rule on this

matter.

## I.     <u>PROCEDURAL HISTORY</u>.

Plaintiff Gwendolyn Anderson ("Ms. Anderson" or "Plaintiff") initiated this

matter by filing a four-count Complaint against Defendant Lehigh Valley Hospital ("LVH" or

"Defendant") on February 15, 2013.  On October 8, 2013, Plaintiff filed her First Amended

Complaint.  Count I of the First Amended Complaint asserts a federal law cause of action for

violations of the Americans With Disabilities Act of 1990 ("ADA") for failure to provide or

allow reasonable accommodations of Plaintiff's alleged disability so that she could continue to

fulfill her duties as a registered nurse and for discriminatory discharge of Plaintiff.  Count II

avers a claim for retaliation under the ADA.  Count III asserts a pendent state law cause of action pursuant to the Pennsylvania Human Relations Act ("PHRA") for failure to provide reasonable accommodation and for discriminatory discharge.  Count IV asserts a claim for retaliation under the PHRA.

On December 14, 2009, LVH filed its answer to the First Amended Complaint. The parties engaged in discovery and Defendant filed its Motion for Summary Judgment on August 8, 2014.  In Response to Defendant's Motion for Summary Judgment, Plaintiff withdrew her ADA and PHRA retaliation claims found at Counts II and IV of the First Amended Complaint.  LVH's Reply Brief in Support of the Motion for Summary Judgment was filed on September 9, 2014.  On September 29, 2014, upon the parties' request, the Honorable Joel H. Slomsky referred this case to the undersigned to conduct all proceedings and order the entry of final judgment in accordance with 28 U.S.C. § 636© and Fed. R. Civ. P. 73.

## II.   FACTS.

Based upon the record papers, exhibits, depositions, and the parties' statements of the facts,[1] the pertinent facts to this Court's determination, set forth herein in the light most favorable to Plaintiff and taking Plaintiff's deposition testimony regarding matters for which she has personal knowledge as true are as follows:

### Plaintiff's Hire and LVH Policies

LVH maintains policies which prohibit discrimination on the basis of any

---

[1]    In conjunction with the filing of its motion for summary judgment on August 8, 2014, LVH submitted its statement of uncontested material facts.  Ms. Anderson responded to this statement of uncontested facts on August 29, 2014 when she filed her response in opposition to the motion for summary judgment.  In so doing, Ms. Anderson admitted most of the facts submitted by LVH.  The admitted facts are included within this Memorandum.

protected category, including disability. Unlawful Discrimination Policy, #2001.40, EEOC-052-53; Equal Employment Policy, #1001.10, EEOC-049-50.  LVH maintains a policy with respect to the Americans with Disabilities Act and requests for reasonable accommodation. Americans with Disabilities Act and the Interactive Process for Requesting a Reasonable Accommodation, #1001.15, LVHN 0632-37; Eggen Dep. 31:20-32:7.  LVH maintains an Employee Counseling and Discipline Policy, No. 2000.40, which applies to all employees. EEOC-062-67.  The Employee Counseling and Discipline Policy provides employees with the opportunity to improve performance following counseling. EEOC-062-67 at § IV.1.B.  All circumstances are evaluated on a case-by-case basis to determine what level of discipline may be appropriate to address any potential misconduct. EEOC-062-67 at § IV.2.

Plaintiff was hired on or about February 12, 2007 as an R.N. in the Pediatric Endocrinology Department at Lehigh Valley Physicians Group. LVH's Response to Interrogatory #5; Offer Letter, LVHN 0156; Pl. Dep. 38:2-18.

<u>Plaintiff's Pre-Meningitis Performance Issues</u>

Plaintiff was provided with an Employee Performance Assessment in 2007, which was completed by Lillian Bracy. Employee Performance Assessment dated August 29, 2007. LVHN 0162-67.  In the section titled Opportunities for Improvement, the 2007 Employee Performance Assessment for Plaintiff stated "[n]eeds to show more initiative, display ability to multitask." LVHN 0165.  Each Clinical Evaluation received by Plaintiff rated her either average or below average in clinical competency. LVHN 0281, 0282, 0286, 0287.

Plaintiff transferred to the Float Pool for Lehigh Valley Physicians Group on or about February 28, 2008. LVH's Response to Interrogatory #5; Pl. Dep. 41:5-11.  After

3

transferring into the Float Pool, Plaintiff was evaluated by several Practice Managers and Clinical Coordinators. LVHN 0281, 0282, 0286, 0287.  Plaintiff agrees that the Clinical Evaluation forms suggest she needed to show improvement relative to messages and urgent triaging.  Pl. Dep. 42:1-43:20.  A Clinical Evaluation form dated April 29, 2008 states that Plaintiff "[d]oes not appear to feel comfortable in triaging urgent, emergent needs of patients to be evaluated." LVHN 0287.  In June 2008, Plaintiff was provided with Employee Performance Goals by her then-supervisor Deborah Lutz to address concerns with her performance. LVHN 0263-64; Pl. Dep. 45:5-8.  A Clinical Evaluation form dated June 2, 2008 states that Plaintiff "needs to demonstrate that she is capable of handling phone messages & assisting physicians she works with." LVHN 0286.  A Clinical Evaluation form dated July 8, 2008 states "[t]he areas that need improvement would be doing more proactive reading between the lines re: questions to ask, information that can be gathered relating to messages and urgent triaging." LVHN 0281, 0282.

On or about September 11, 2008, two physicians in the practice provided specific examples of issues or concerns they had with Plaintiff's performance. Pl. Dep. 44:23-49:21; Notes of Lillian Bracy, LVHN 0370-71 (listing "specific phone messages & examples" provided by two physicians of "some of the issues/concerns that they have been having with [Plaintiff]"). The September 11, 2008 documents noted that Plaintiff "[d]oes not follow phone message process and phone triage procedures completely and accurately" and that she was "not timely with responses to physicians on given tasks (delay in giving physician messages and following through on messages)." Notes of Lillian Bracy, LVHN 0370-71.  On or about September 17, 2008, Plaintiff sought a transfer out of the Float Pool.  LVHN 0383-84; Pl. Dep. 49:21-51:9.

On or about October 3, 2008, while still employed in the Float Pool, Plaintiff was

given a written warning.  Personnel Report, LVHN 0155; Pl. Dep. 51:19-53:22.  On or about

October 3, 2008, Plaintiff was rated two (2) out of a possible five (5) on the Employee

Performance Goals that had been provided to her in June 2008. LVHN 0268-69 (Ex. B); see also

LVHN 0256-58 (Ex. B).  The October 3, 2008 Personnel Report states that Plaintiff was being

counseled due to her "phone triaging" and referenced Plaintiff's "lack of critical thinking skills,

demonstrated lack of organizational skills, and demonstrated poor documentation skills."

Personnel Report, LVHN 0155; Pl. Dep. 49:9-13.  The October 3, 2008 Personnel Report

attached a "Summary of Findings" document that listed, among other things, Plaintiff's

"[i]nappropriate triaging procedures" and "[t]elephone message errors." Summary of Findings,

LVHN 0352-59.

<u>Plaintiff's Meningitis Infection and Return to Work</u>

In or about December, 2008, Plaintiff was hospitalized with bacterial meningitis.

Pl. Dep. 58:15-20.  Plaintiff was in the hospital for approximately one (1) month during which

she was placed into a medically induced coma which caused her various cognitive and

neurological symptoms including the inability to speak followed by slow and slurred speech in

addition to concentration problems and forgetfulness. Pl. Dep. 58:15-25; 59:1-25; 60:1-14; Am.

Compl., ¶¶ 9, 11, 17, 18, 19; Anderson 2008 Medical Records; 1/09/09 Employee Health Record

Notation (Dep. Exh. Saunders 1).   Plaintiff applied and was approved for FMLA leave related to

her absence from work.  LVHN 0075-77; 0073-74.

Plaintiff was cleared to return to full duty work, without restrictions, by Employee

Health Services on January 9, 2009.  Employee Health Record, LVHN 0068-69; 0071; Pl. Dep.

92:15-24.  Plaintiff applied for a transfer to an R.N. position in the Lehigh Valley Family Health

Center ("FHC") in or about May 2009, and was offered the position. LVHN 0301; Pl. Dep. 80:14-23.  Plaintiff transferred to the FHC on or about June 1, 2009. LVH's Response to Interrogatory #5; Personnel Action Form, LVHN 0144; Pl. Dep. 85:19-86:1.  In or about June 2009, Kathleen Straubinger became Plaintiff's supervisor. Pl. Dep. 100:24-101:6; Straubinger Dep. 29:18-20; 43:15-23.

Plaintiff's job as an R.N. in the FHC required critical thinking and multi-tasking. Pl. Dep. 105:13-19.  Plaintiff admits that she was "making errors" when she tried to multi-task in her role as R.N. in the FHC. Pl. Dep. 105:20-25.  Plaintiff found her responsibilities to triage patients over the telephone to be overwhelming and stressful. Pl. Dep. 107:17-20; 112:19-24; LVHN 0522.  Plaintiff also testified that she was provided no training to perform the phone triage responsibilities and that these responsibilities increased substantially in June 2009 when two (2) other full time R.N.'s left the Family Health Center.  Pl. Dep. 87:2-11; 88:5-12. 95:15-17. Plaintiff's former supervisor, Ms. Straubinger admitted that the loss of two (2) R.N.'s during this time frame caused increased phone triage responsibilities for the remaining R.N.'s including Plaintiff and that Plaintiff was not the only R.N. to struggle with these increased responsibilities. Straubinger Dep. 75: 10-13; 81: 6-22.   Plaintiff was removed from triage phone nurse duties in or about August 2009.  Pl. Dep. 113:8-10 ("I received calls to triage, but I wasn't put specifically down at the desk"); LVHN 0526.

In September 2010, Plaintiff misplaced EKG leads on a patient. Pl. Dep. 115:19-116:3; 146:1-23; LVHN 0514.  In November 2010, Plaintiff entered into an Education and Retention Agreement with Lehigh Valley Health Network providing Plaintiff with the reimbursement for the costs of a Guided Care Nursing Course and Certification exam. LVHN

0456-58.  Plaintiff completed the Guided Care Nursing Course and took the Guided Care

Nursing Examination. LVHN 0459-60.  Plaintiff failed the Guided Care Nursing Examination,

scoring 60% on "Questions that require reasoning" and 56% on "Questions focused on

medication knowledge." LVHN 0459; May 10, 2011 Letter, LVHN 0461; Pl. Dep. 116:11-117:2;

293:13-15.  Plaintiff requested that LVH pay for her to retake the Guided Care Nursing

Examination. Straubinger Dep. 99:4-18.  Plaintiff's Manager, Kathleen Straubinger denied

Plaintiff's request.  Handwritten Note of Kathleen Straubinger, LVHN 0462; May 25, 2011

email, Ex. 34 to Pl. Dep.; Straubinger Dep. 99:11-17; 115:4-18.

   On or about January 27, 2011, Plaintiff was given a written warning for failure to

perform her duties. Personnel Report, LVHN 0130 (stating that Plaintiff was given a warning

related to her conduct which risked "Patient and Staff safety due to [Acupuncture] warming light

on and Employee failure to complete task assigned"); LVHN 0131 ("I sincerely apologize for not

taking down or removing the equipment . . . . I will certainly be more responsible moving

forward."); Pl. Dep. 118:18-119:14; 120:1-23; Straubinger Dep. 90:17-21; 92:2-16.  File

documentation reflects that Plaintiff placed a note in the wrong area of a patient's chart in

January 2011 and sent an unmarked specimen to the lab in February 2011.  LVHN 0506-07;

LVHN 0502-03.  Plaintiff does not remember whether she made these mistakes. Pl. Dep.

120:24-121:23.

   File documentation prepared by Ms. Straubinger reflects twelve (12) separate

instances where Plaintiff committed some type of nursing error between September of 2010 and

June of 2011.  Pl. Dep. 146:1-23; LVHN 0416-17.  Plaintiff admits to at least five (5) of these

errors, including a medication refill error in January/February 2011 and an incident where

Plaintiff gave a patient the wrong vaccine in February 2011. LVHN 0508-13; Pl. Dep. 122:1-24; 146:1-23.

       Plaintiff was verbally counseled by Ms. Straubinger in May 2011 related to several errors.  LVHN 0416-17; Pl. Dep. 134:21-135:9.  During this counseling meeting, Ms. Straubinger expressed concern regarding Plaintiff's critical thinking skills. Pl. Dep. 125:14-126:6; Straubinger Dep. 110:19-111:3. Ms. Straubinger also expressed her belief that Plaintiff was suffering from cognitive problems and that Plaintiff was requesting tools and skills to help her to do her job. Straubinger Dep. 106: 24-25; 107:1. Ms. Straubinger further suggested during this meeting that Plaintiff's problems may have been connected to her past illness. Straubinger Dep. 112: 7-19. Ms. Straubinger later informed her superior, Susan Jones, Practice Administrator, that Plaintiff appeared to be offended by the suggestion made by Ms. Straubinger during the meeting that the problem Plaintiff was having at work was connected to her past illness and denied that fact. Jones Dep. 19: 7-12; 21: 10-14.

       During the May 2011 counseling meeting, Ms. Straubinger suggested that Plaintiff have her cognitive function checked to assess whether the difficulties Plaintiff was having with reasoning, memory and medication knowledge were related in any way to a medical condition. Pl. Dep. 130:12-25.[2]  At this meeting with Ms. Straubinger, Plaintiff asked if "[Ms. Straubinger] could help [her] to do the job." Pl. Dep. 133:11-134:7.  During this meeting, Ms. Staubinger asked Plaintiff to write down "what [she] was feeling about the job." Pl. Dep. 140:18-142:17; EEOC-086; LVHN 0463-64.  Plaintiff "felt like [she] was doing too many things at one time."

---

[2]    Plaintiff testified inconsistently as to whether she believed that she had cognitive deficits at that time which were related to a medical condition. Pl. Dep. 131:1-4; 132:13-21.

Pl. Dep. 142:1-2.  As of June 2011, Plaintiff was making medication errors, communication errors and was having difficulty completing tasks on a timely basis. Pl. Dep. 143:12-44:3.

On or about June 8, 2011, Plaintiff was placed on an action plan to address her performance issues. Pl. Dep. 143:9-144:25; LVHN 0413-14; LVHN 0221-22 (Ex. B); Straubinger Dep. 127:5-128:4; 128:21-129:20.  Plaintiff admits that it was appropriate for Ms. Staubinger to create an action plan for her. Pl. Dep. 144:4-7.  On or about June 15, 2011, Plaintiff reported to Ms. Straubinger that she felt "overwhelmed" performing phone nurse duties. Pl. Dep. 147:2-16 ("I was having certain issues with the phone triage duties."); LVHN 0470.

On June 22, 2011, Plaintiff made an error related to a patient's critical lab value. Pl.'s Resp. to Request for Admission #9; LVHN 0483, 0500; Pl. Dep. 149:21-150:15; Straubinger Dep. 134:7-138:23; LVHN 0691-95.  Plaintiff's error on June 22, 2011 was deemed a patient safety issue by the Medical Director of the FHC. Straubinger Dep. 139:9-18.  Plaintiff had not read a note stating that a patient had a critical lab value and, as a result, did not contact the patient to come in to the FHC for an appointment. Straubinger Dep. 136:8-138:23.  On or about July 13, 2011, Plaintiff received a final warning related to the incident that took place on June 22, 2011. Personnel Report, LVHN 0410-411; LVHN 0483 (e-mail re: June 22, 2011 incident); Pl. Dep. 150:16-152:21.

Following the June 22, 2011 incident, certain of Plaintiff's duties were removed due to patient safety concerns, including phone nursing duties. Straubinger Dep. 140:11-18; 140:25-141:4; 148:10-13 ("She was not safe to be doing the full scope of an R.N.'s responsibilities.").  Without the input of a member of Employee Health or Human Resources, Ms. Straubinger with the participation of Ms. Jones reduced Plaintiff' job responsibilities to

rooming patients, escorting patients and taking vital signs. Straubinger Dep. 148: 4-21; 149: 18-25; Jones Dep. 61: 14-25; 61:1-8; R.N. Job Description (Dep. Exh. Straubinger 2).

Plaintiff had a meeting with Practice Administrator Susan Jones (Kathleen Straubinger's supervisor) on or about July 22, 2011, during which Plaintiff spoke about how she was struggling to perform her duties at work. Pl. Am. Compl. ECF No. 14 at ¶ 20 ("On or [sic] July 22, 2011, Plaintiff met with Ms. Jones during which she explained that she felt stressed out due to the phone triage nurse duties recently given to her and that she was having difficulties concentrating due to these added responsibilities."); Jones Dep. 65:9-67:15.  Following the July 22, 2011 meeting, Plaintiff was sent to Employee Health Services for a fitness for duty evaluation to assess whether her errors at work were due to any potential medical condition. July 22, 2011 Email re: Fitness for Duty Approval, LVHN 0045; Pl. Dep. 153:4-20; see also documents provided to Employee Health, LVHN 0047-63; Straubinger Dep. 141:5-10; Jones Dep. 68:2-23; Guanowsky Dep. 49:13-15; 50:10-13.

Employee Health Services' evaluation was performed by Dr. Celeste Saunders. The evaluation report stated that Plaintiff "needs further medical evaluation by her treating physician. Can continue working, suggesting [sic] limiting multitasking assignments until this is completed. Needs to be seen in [Employee Health] again with note from Dr. Gopal [her primary care physician] about her evaluation." Employee Health Fitness-for-Duty Evaluation, LVHN 0044; July 27, 2011 email, LVHN 0009.  The report does not indicate that Plaintiff was unsafe to return to work, that she was suffering from cognitive problems or that she could not perform the essential duties of her position. 7/27/11 Fitness for Duty Report; (Dep. Exh. Saunders 3). If Dr. Saunders had felt Plaintiff to be unsafe or unfit to return to work she would have indicated as

10

much in her report. Saunders Dep. 77: 7-22.

In a letter dated July 27, 2011 to Plaintiff's primary care physician, Dr. Saunders stated that Plaintiff "has been having performance issues at work including medication errors and communication errors" and asked Plaintiff's primary care physician, Dr. Gopal, to "evaluate and advise whether [Plaintiff] is safe to return to work in the capacity of RN." LVHN 0006; Saunders Dep. 82:5-19.

On or about August 22, 2011, Plaintiff received her Annual Performance Review. LVHN 0229-40; Straubinger Dep. 162:4-22. In the Annual Performance Review, Plaintiff was rated a 2 out of 5 (Partially Meets Expectations) for the following categories and the review included the following comments in each of these categories:

1.3 Intervenes to prevent, minimize or correct actual or potential patient risks, based upon observation of physiological, behavioral and environmental factors (multiple med errors and communication errors)

1.4 Functions within the Scope of Practice of a Registered Professional Nurse. Refers problems beyond the Scope of Practice appropriately (action plan and unable to me[e]t RN expectations)

1.6 Performs patient care and procedures, utilizing sound clinical judgment, approved procedures/techniques, equipment and supplies (action plan and unable to meet RN expectations)

2.3 Utilizes sound clinical judgment, protocols and written provider direction to manage patient care (Lack of clinical judgment noted in several cases- action plan June, 2011)

2.4 Collaborates with providers, ancillary personnel, community resources and other interdisciplinary team members to resolve patient needs (does not seek out resources to assist in patient care planning, problem solving or care planning)

10.1 Utilizes approved reference books ([Plaintiff] does not demonstrate use of resources)

     10.2 Utilizes protocol books as determined by LVPG ([Plaintiff] does not demonstrate use of resources)

     10.3 Utilizes practice guidelines written by the provider or LVPG ([Plaintiff] does not demonstrate use of resources).

LVHN 0229-40; see also LVHN 0416-17; Pl. Dep. 156:25-159-23.  In the 2011 Annual

Performance Review, Plaintiff was rated a 1 out of 5 (Does Not Meet Expectations) in the

following category:

     1.5 Provides Phone Advice to patients and responds to patient inquiries using sound clinical judgment, protocols and guidelines (unable to function safely in the duty of phone advi[c]e multiple errors).

LVHN 0229-40.

        Plaintiff's primary care physician Dr. Gopal ordered neurobehavioral testing by

Dr. David Glosser. Guanowsky Dep. 71:3-15.  On or about October 24, 2011, LVH's Employee

Health Services received the Neurobehavioral Assessment Report of Dr. Glosser regarding the

testing that he performed on Plaintiff. LVHN 0032-38; DSG 003-19.  Dr. Glosser's Assessment

Report stated that Plaintiff was "complaining of mental 'fuzziness'" and "fears that she may be

making mistakes at work and is fearful about perhaps performing incorrect immunizations. She

feels overstressed when dealing with phone triage and having to deal with multiple sources of

information which approach her simultaneously. She finds that she cannot shift rapidly from one

task to another." LVHN 0032; DSG 003.  Dr. Glosser's Assessment Report stated that Plaintiff

estimated her level of cognitive function at "80-90%" of pre-infection levels, which has

purportedly caused her stress and resulted in decreased memory, and increased her reliance on

GPS and compensatory strategies such as note-taking. DSG 003.  Dr. Glosser's Assessment

Report concluded that, "[Plaintiff is] of pre-morbidly average to above average general

intellectual ability . . . . Memory is good, but she is having trouble with word finding, mild depression, and mildly decreased mental Processing Speed." The report further states that "[t]here is no clear cut psychiatric diagnosis." DSG 009.

Dr. Glosser's Assessment Report stated that he "suggested [Plaintiff] could return to office nursing though she would probably be more comfortable if she did not have to handle multiple simultaneous tasks." LVHN 0037; DSG 008. Dr. Glosser's report does not indicate that Plaintiff was in any manner unsafe to return to work as an R.N. for Defendant nor restricted from performing any of the essential duties of her position. Neurobehavioral Assessment (Dep. Exh. Saunders 7). Dr. Glosser did not give Plaintiff any diagnosis. Pl. Dep. 163:4-5; DSG 019 ("DSM-IV diagnosis: none").

Plaintiff is not aware of any medical diagnosis for her alleged "memory issues" and "multitasking issues." Pl. Dep. 262:16-263:11. The Report by Dr. Glosser was reviewed by Dr. Saunders of Employee Health Services to assess what accommodations might enable Plaintiff to perform the essential functions of her position of Registered Nurse, if any. LVHN 0451; Saunders Dep. 86:3-6; 90:4-7. After reviewing Dr. Glosser's Report and assessing Plaintiff, on or about October 28, 2011, Dr. Saunders recommended "Continue limiting multitasking assignments until further notice." LVHN 0008.

Following receipt and evaluation of Dr. Glosser's Assessment Report, Plaintiff continued on restricted duty and was not responsible for the performance of phone triage duties at the front desk. Pl. Dep. 161:21-162:13; LVHN 0014. Dr. Saunders of Employee Health Services sought and received permission from Plaintiff to contact Plaintiff's primary care physician (Dr. Gopal) to discuss the testing results from Dr. Glosser. LVHN 0005. Dr. Saunders

attempted to contact Dr. Gopal, but did not receive a response.  LVHN 0014; LVHN 0803;

Saunders Dep. 108:4-9.  After Dr. Saunders received no response from Dr. Gopal, she sent a

follow-up letter dated November 18, 2011 asking for feedback and informing Dr. Gopal that

Plaintiff had been placed out of work due to an "error/patient safety issue." LVHN 0004; LVHN

0803; Saunders Dep. 109:7-24.

On November 25, 2011, LVH held a meeting with Plaintiff to discuss possible

reasonable accommodations that could be offered. Pl. Dep. 178:6-16; Straubinger Dep.

177:12-179-9; Eggen Dep. 68:17-69:3; Jones Dep. 86:14-16; 89:17-90:16; LVHN 0209; LVHN

0439; LVHN 0423.  During the meeting, LVH's Verification of Request for Accommodation

Under the Americans with Disabilities Act Form was filled out by Human Resources Consultant

Charles Eggen. LVHN 0209; Eggen Dep. 70:25-73:17. The Form states:

> Disability identified by employee/applicant:"Concentration/Memory/Focus"
>
> List limitations that prevent the employee/applicant from performing one or more
> major life activities: "Multitasking – Recall words to Respond, Name Recall,
> Prioritizing in Terms of Urgency, Short-term memory lapse, forgets time for
> particular action"
>
> List limitations that prevent the employee/applicant from performing the essential
> functions of the position: "Multitasking, Upsetting, Mistakes—labs, triage, front
> desk, prioritizing, focus"
>
> List employee's/applicant's requested accommodation(s): "Other RN double
> check work, fear of hurting patients"

LVHN 0209; Eggen Dep. 71:24-73:8; 77:14-17.  According to Plaintiff and despite the notations

on LVH's Verification of Request for Accommodation Under the Americans with Disabilities

Act Form, both during the November 25, 2011 meeting and otherwise, Plaintiff never requested a

specific reasonable accommodation. Pl. Dep. 180:25-181:7; 184:9-185:14; 133:11-134:7;

14

152:23-153:2.  According to Plaintiff, she asked only for "help." Pl. Dep. 184:9-185:14; 133:11-134:7.[3]

<u>Termination of Employment</u>

On November 9, 2011, Plaintiff did not call or page a doctor when she received notification of a patient's high blood sugar number. LVHN 0010; LVHN 0423; LVHN 0408; Pl. Dep. 167:8-168:6; 168:22-169:4; 171:6-12; 204:15-205:6; 209:14-17; 212:6-9; Straubinger Dep. 159:14-160:11.  Plaintiff did not call or page a doctor when she received notification of a patient's high blood sugar number because her shift was ending and she was preparing to leave work for the day.  Pl. Dep. 211:4-11.  Before Plaintiff left work on November 9, 2011, she was called into a meeting with Ms. Straubinger concerning Plaintiff not calling or paging a physician regarding a patient's high blood sugar value. Pl. Dep. 213:12-215:14.

Given this "serious near miss event," Kathleen Staubinger did not "think [Plaintiff] [was] safe to be working [as an RN]." LVHN 0010.  Following the failure to communicate the critical lab value to a physician by phone or pager, Plaintiff was placed out of work with pay. LVHN 0014; LVHN 0801; Pl. Dep. 172:20-173:4; 231:19-24; Guanowsky Dep.

---

[3]    While the Court must take this statement by Plaintiff as true for purposes of summary judgment, LVH notes that all other witnesses as well as contemporaneous documentary evidence show that Plaintiff did request a specific accommodation, i.e., that another employee be assigned to her to check her work.  January 11, 2012 email from Susan Jones, LVHN 0007 (stating that Plaintiff "feels that if someone checked all her work, and worked side by side with her, she could function well."); January 10, 2012 Letter from Dr. Gopal, LVHN 0003 ("She might need initially somebody overlooking her work"); January 16, 2012 Letter from Carol Guanowsky, LVHN 0001 ("Human resources and [Plaintiff's] supervisor subsequently met with [Plaintiff] to discuss possible accommodations on November 25, 2011. She indicated that she needed someone to check all of her work"); November 25, 2011 Verification of Request for Accommodation Under The Americans With Disabilities Act, LVHN 0209; Eggen Dep. 73:5-8 (testifying that during the November 25, 2011 meeting Plaintiff requested "another R.N. to double check her, she felt uncomfortable"); Straubinger Dep. 183:3-23 (testifying that during the November 25, 2011 meeting Plaintiff "shared that she thought if she had another R.N., another nurse that could oversee and look at all of her work."); Jones Dep. 89:17-90:16 (testifying that during the November 25, 2011 meeting Plaintiff said "that she believed she could do [her job] if we provided her with another RN to sit with her while – and to be with her all the time while she was at work and double checking her work").

73:21-25.

On December 9, 2011, Plaintiff was terminated. Personnel Report, LVHN 0115; LVHN 0423; Pl. Dep. 219:5-7; Straubinger Dep. 192:1-6; Eggen Dep. 80:4-10.  The December 9, 2011 Personnel Report states, "Due to the serious nature of the lab value, RN employee needed to notified [sic] the provider (who was available) by page or called for immediate attention by another provider. In addition, there was a previous phone note from the front office staff communicating an earlier contact which would have also been noted.  RN Employee left work (due to regular schedule) shortly after phone note sent. RN Employee did not report critical lab to another nurse or clinical coordinator." LVHN 0115; Pl. Dep. 220:3-16.  Following her termination, Plaintiff asked to and met with Practice Administrator Susan Jones. LVHN 0007 ; Pl. Dep. 228:2-229:5; Jones Dep. 97:14-98:12.

In a letter dated January 10, 2012 (received by Employee Health Services on January 13, 2012), Plaintiff's primary care physician Dr. Gopal stated that in her opinion, Plaintiff "would benefit from occupational therapy and she should be accommodated at her work. She might need initially somebody overlooking her work until she goes through occupational therapy so she can multitask again." LVHN 0003.  From the time of Plaintiff's hospitalization in December 2008 through the date of Plaintiff's deposition in May 2014, Plaintiff never sought or received any occupational therapy. Pl. Dep. 62:5-9; 62:17-23; 65:10-66:5; 244:9-11.  In a letter dated January 16, 2012, the Director of Employee Health Services, Carol Guanowsky, responded to Dr. Gopal's January 10, 2012 letter. LVHN 0001 ("I presume that you are responding to our requests of July 27, 2011 and November 18, 2011").  In the letter, Ms. Guanowsky set out the information as to what had taken place and stated that LVH "did not receive any communication

from [Dr. Gopal] regarding the evaluation, restrictions, accommodations and/or possible treatment." Ms. Guanowsky further stated "You state that therapy may be of value, however, it appears you never ordered therapy, or we were never informed of it. In addition, you are not specifying, even at this juncture, what type of therapy might be helpful, the duration of therapy, etc., in order to assess whether this is something that can be reasonably accommodated." LVHN 0001.

According to Plaintiff, Dr. Gopal was out of the country at some point in the Fall of 2011. Plaintiff does not know when Dr. Gopal left or returned to the United States. Pl. Dep. 202:11-23. Plaintiff had medical appointments with Dr. Gopal's office (Muhlenberg Primary Care) on August 2, 2011, September 8, 2011, September 14, 2011, September 17, 2011, October 13, 2011, November 29, 2011 and December 20, 2011. MPC (GOPAL) 027; 026; 025; 024, 023, 022, 021.

In or about February 2012, Plaintiff applied for a position as a R.N. with ABC Family Pediatrics-Pond Road, a practice of Lehigh Valley Physicians Group, a subsidiary of Lehigh Valley Health Network. Pl. Dep. 252:19-22.  On or about February 20, 2012, Plaintiff was interviewed for an R.N. position with ABC Family Pediatrics-Pond Road.  Pl. Dep. 252:23-253:1.   After learning that Plaintiff was not eligible for rehire, Plaintiff was no longer considered for the position at ABC Family Pediatrics-Pond Road.  Eggen Dep. 90:10-22 ; LVHN 0117.  Even if Plaintiff had been eligible for rehire, the Associate Practice Director of ABC Family Pediatrics-Pond Road testified that Plaintiff may not have been offered the position. Bickert Dep. 53:9-12; 44:25-45:9.

Plaintiff disavowed at her deposition the allegation in her Amended Complaint

that she was terminated from her position with Defendant because of any request for an accommodation. Pl. Dep. 271:3-21.  Plaintiff testified at her deposition that she did not make any complaint of disability discrimination to Human Resources or management prior to the termination of her employment.  Pl. Dep. 272:3-20; 273:6-276:2.

Following the termination of her employment, Plaintiff received three employee counselling/warning notices from a subsequent employer, including one for failure to administer medication to a nursing home resident. Pl. Dep. 307:1-308:8; HCR ManorCare Coaching/Counseling Form, MCA 014; Pl. Dep. 308:9-309:19; HCR ManorCare Employee Warning Notice, MCA 015; Pl. Dep. 309:20-310:14; HCR ManorCare Employee Warning Notice, MCA 017.

<u>Procedural Background</u>

On or about March 29, 2012, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission asserting claims of disability discrimination and retaliation. EEOC-016-19.  Following the filing of a Charge of Discrimination with the Equal Employment Opportunity Commission, on April 15, 2013, Plaintiff filed a Complaint asserting claims of discrimination, failure to accommodate and retaliation under the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.* and retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*  ECF No. 1.  LVH filed a Motion to Dismiss and/or Strike (In Part) Plaintiff's Complaint. (ECF No. 7).  The Court granted Plaintiff leave to amend her Complaint. ECF No. 13.  On October 8, 2013, Plaintiff filed a First Amended Complaint asserting claims of disability discrimination—discharge and failure to provide a reasonable

18

accommodation and retaliation under the ADA and PHRA.  ECF No. 14.

## III.   STANDARD OF REVIEW.

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Anderson, 477 U.S. at 249.  A factual dispute is material only if it might affect the outcome of the suit under governing law.  Id. at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present specific facts showing that there is a genuine issue for trial and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex, 477 U.S. at 325).  The non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim. Celotex, 477 U.S. at 322-323.  If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper.  Id. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir.

19

1987).  When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' - that is, pointing out to the District Court - that there is an absence of evidence to support the non-moving party's case."  <u>Jones v. Indiana Area Sch. Dist.</u>, 397 F. Supp.2d 628, 642 (W.D. Pa. 2005) (quoting <u>Celotex</u>, 477 U.S. at 325).

## IV.   <u>DISCUSSION.</u>

Subject matter jurisdiction in this case is proper pursuant to 28 U.S.C. § 1331. Because Plaintiff's PHRA claim forms part of the same case or controversy, subject matter jurisdiction over that claim is proper pursuant to 28 U.S.C. § 1367(a).

### A.   **Plaintiff's Disability Discrimination Claim.**[4]

Plaintiff's disability discrimination claims are analyzed pursuant to the burden-shifting framework articulated in <u>McDonnell Douglas Corp v. Green</u>, 411 U.S. 792, 802-805 (1973).  <u>See</u> <u>Williams v. Phila. Hous. Auth. Police Dept.</u>, 380 F.3d 751, 759 (3d Cir. 2004), <i>cert. denied</i>, 544 U.S. 961 (2005).  Pursuant to this framework, a plaintiff must first make out a prima facie case of discrimination or retaliation.  <u>Williams</u>, 380 F.3d at 761 (citing <u>Taylor v. Phoenixville School Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999)).  If the plaintiff is successful, the burden shifts to the defendant to articulate a legitimate, non-discriminatory rationale for each challenged employment action.  <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994).  Finally, the plaintiff bears the burden of demonstrating, by a preponderance of the evidence, that the defendant's articulated reason for the challenged action is a pretext for unlawful discrimination.

---

[4]     Ms. Anderson's ADA and PHRA claims are governed by the <u>McDonnell Douglas</u> framework. <u>Ball v. Einstein Cmty. Health Assocs.</u>, 514 F.App'x 196, 199 n.5 (3d Cir. 2013)(citing <u>Williams v. Phila. Hous. Auth. Police Dept.</u>, 380 F.3d 751, 759 (3d Cir. 2004, <i>cert. denied</i>, 544 U.S. 961 (2005))).  Accordingly, we will only discuss Ms. Anderson's ADA claim because our analysis of that claim is, under the circumstances of this case, coterminous with the PCRA claim.

McDonnell Douglas, 411 U.S. at 804-05; Bielich v. Johnson & Johnson, Inc., 6 F. Supp.3d 589, 605 (W.D. Pa. 2014)(citations omitted).

To state a prima facie case of discrimination, plaintiff must demonstrate that: (1) she is a disabled person within the meaning of the ADA; (2) she was qualified for the position she held; and (3) she suffered an adverse employment action under circumstances that could give rise to an inference of unlawful discrimination on the basis of that disability.  Glass v. Armstrong Utils., No. 13-1173, 2014 U.S. Dist. LEXIS 171138, at *13-*14 (W.D. Pa. Nov. 2014) (citing Proudfoot v. Arnold Logistics, LLC, No. 1:13-CV-1650, 2014 U.S. Dist. LEXIS 158669, at *5 (M.D. Pa. Nov. 10, 2014) and Bielich, 6 F.Supp. 3d at 611).  Here, LVH challenges each aspect of Ms. Anderson's prima facie case, contending that she is not disabled, was not qualified for the position she held and that she cannot adduce any evidence of record to create a material issue of fact for trial that her termination had anything to do with her alleged undiagnosed medical issue as opposed to her repeated errors which risked patient safety.  For purposes of this analysis and despite LVH's contention that Ms. Anderson has not established her prima facie case, the Court will assume that Ms. Anderson has established her prima facie case because the burden at that stage is "much less onerous than proving pretext with similar evidence."  Glass, 2014 U.S. Dist. LEXIS 171138, at *13-*14 (quoting Opsatnik v. Norfolk Southern Corp., No. 06-81, 2008 U.S. Dist. LEXIS 26727 at *4 (W.D. Pa. Mar. 20, 2008), aff'd, 335 F. App'x 220 (3d Cir. 2009) (citing Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998)).

The burden then shifts to LVH to articulate a legitimate, non-discriminatory rationale for its firing of Ms. Anderson.  Fuentes, 32 F.3d at 763.  LVH maintains that Ms. Anderson was terminated in December 2011 because of her recurrent performance issues, several

21

significant patient safety errors and LVH's progressive discipline of her over the course of the entire year of 2011.  LVH points to the following errors committed by Ms. Anderson during 2011 for which she was counseled: risking patient and staff safety by not turning off equipment and not communicating with staff members in or about January 2011; sending an unmarked specimen to the lab in February 2011; making a medication refill error for a patient in or about January/February 2011; giving a patient the wrong vaccine in February 2011; failing to handle her phone nurse duties by not requiring a patient with a critical lab value to come into the office in June 2011; and failing to contact a physician by pager or telephone regarding a patient's critical lab value in November, 2011, even after her role was reduced on a temporary basis.

LVH notes that although Ms. Anderson was placed on an action plan to address her performance deficiencies in June 2011, she did not improve her performance.  They also note that her work errors at the Family Health Center were substantially similar to the errors that she made in her prior registered nurse position at LVH in the Float Pool from February 2008 through May 2009.  Plaintiff was disciplined prior to her December 2008 hospitalization for almost exactly the same types of errors that ultimately led to her termination.

LVH also argues that had it allowed Plaintiff to continue to work in her position, it clearly would have created significant risk to the health and safety of its patients being treated at the Family Health Center.  Sever v. Postmaster Gen., 220 F. App'x 159, 161-62 (3d Cir. 2007) (affirming district court grant of summary judgment, finding plaintiff posed direct threat to health or safety of others, and stating "[t]hough an employer is prohibited from discharging an employee based on his disability, the employer is not prohibited from discharging an employee for misconduct, even if that misconduct is related to his disability.") (citations omitted); Grosso

v. UPMC, 857 F. Supp.2d 517, 537-39 (W.D. Pa. 2012) (granting summary judgment finding

plaintiff posed direct threat to defendants' patients).   Based on well-documented evidence,

LVH's proffered reason for firing Plaintiff is legitimate, non-discriminatory and supported by

evidence.

   In order to survive a motion for summary judgment after LVH has articulated a

legitimate, non-discriminatory reason for firing Ms. Anderson, she must produce "sufficient

evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not

its true reasons for the challenged employment action."  Petrikonis v. Wilkes-Barre Hosp. Co.,

LLC, No. 11-280, 2013 U.S. Dist. LEXIS 155487, at *22-*23 (M.D. Pa. Oct. 30, 2013), aff'd,

582 F. App'x 126 (3d Cir. 2014)(quoting Harding v. CareerBuilder, LLC, 168 F. App'x 535, 538

(3d Cir. 2006) (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d

Cir. 1996))).  Ms. Anderson must prove the following:

> To prove pretext by discrediting the employer's articulated reasons, a plaintiff
> must "demonstrate such weaknesses, implausibilities, inconsistencies,
> incoherencies, or contradictions in the employer's proffered legitimate reasons for
> its action that a reasonable factfinder *could* rationally find them unworthy of
> credence and hence infer that the employer did not act for the asserted
> nondiscriminatory reasons."  Fuentes, 32 F.3d at 765 (internal quotation marks
> omitted) (citing Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir.
> 1993)); see also Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 527,
> 531 (3d Cir. 1992); Shaner, 204 F.3d at 501; Reifer, 462 F. Supp. 2d at 635.  The
> plaintiff must show "not merely that the employer's proffered reason[s] [were]
> wrong, but that [they were] so plainly wrong that [they] cannot have been the
> employer's real reason[s]."  Keller, 130 F.3d at 1109. To make this showing, the
> plaintiff may introduce evidence to show "(1) that the proffered reasons had no
> basis in fact[;] (2) that the proffered reasons did not actually motivate [the act;] or
> (3) that they were insufficient to motivate discharge."  Petrikonis v. Wilkes-Barre
> Hosp. Co., No. 11-280, 2013 U.S. Dist. LEXIS 155487, 2013 WL 5877000, at *7
> (M.D. Pa. Oct. 30, 2013) (quoting Harding v. CareerBuilder, LLC, 168 Fed. App'x
> 535, 538 (3d Cir. 2006)) aff'd, No. 13-4403, 2014 U.S. App. LEXIS 17642, 2014
> WL 4493949 (3d Cir. Sept. 12, 2014). The plaintiff is not required to show that

the employer acted with a discriminatory purpose, <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 729 (3d Cir. 1995); <u>Orenge v. Veneman</u>, No. CIV-A-04-297, 2006 U.S. Dist. LEXIS 67291, 2006 WL 2711651, at *14 (W.D. Pa. Sept. 20, 2006), nor is the plaintiff required to present any additional evidence beyond his or her prima facie case.  <u>Fuentes</u>, 32 F.3d at 764; <u>Orenge</u>, 2006 U.S. Dist. LEXIS 67291, 2006 WL 2711651, at *14.

<u>Proudfoot</u>, 2014 U.S. Dist. LEXIS 158669, at *16.  Plaintiff argues in her Response Brief that:

> . . . they point to Plaintiff's write-up for two purported violations of their Critical Lab Value Policy as the reason for her discharge.  *Straubinger Dep.* (Exh. A) 62:4-6; *Eggen Dep.* (Exh. B) 26:3-6. Notably, the second write-up involved a patient's self-report of a high blood sugar, which does not appear to be contemplated by the Critical Lab Value Policy as written in 2011. (The policy appears to have been amended in 2012 to set forth a procedure for addressing patient's self-reported test results). Yet, it was this incident that led directly to her suspension and eventual termination. Notably, Plaintiff testified at her deposition that she was never made aware of the policy and it was not posted on the nursing floor. Anderson Dep. I (Exh. G) 186:25-187:10.

Mem. Law in Supp. Pl.'s Resp., pp. 22-23.  LVH's Critical Test and Result Reporting Policy states that an R.N. "will immediately notify the physician" of critical laboratory results and "[w]hen the provider is notified of the results, the provider will read back the results to the nurse."  Pl. Dep. 216:2-217:3; EEOC-201-05.  Plaintiff suggests that the Critical Test and Result Reporting Policy does not apply to a patient's self-reported blood sugar result.  A review of the policy at issue does not indicate that it does not apply to a patient's self-reported blood sugar result.  Similarly, there is no support in the record for Plaintiff's reference to a purported amendment of the policy "to set forth a procedure for addressing patient's self-reported test results."  Pl. Resp. at 23; LVHN 0778-82; EEOC-201-05.

Plaintiff has not established pretext by introducing evidence to show "(1) that the proffered reasons had no basis in fact[;] (2) that the proffered reasons did not actually motivate [the act;] or (3) that they were insufficient to motivate discharge."  <u>Petrikonis</u>, 2013 U.S. Dist.

LEXIS 155487, at *23 (quoting <u>Harding</u>, 168 Fed. App'x at 538).  Plaintiff was not terminated

for making one error, but rather as a culmination of a progressive discipline process during

which, by Plaintiff's own admission, she committed multiple mistakes.  Ms. Anderson fails to

address LVH's argument that her errors in June and November 2011 had nothing to do with her

purported medical condition and/or the limitations allegedly associated with it.  Plaintiff admits

that she committed several errors at work which risked patient safety.  Am. Compl. at ¶ 27; SMF

at ¶¶ 30, 44.  <u>See</u> <u>Petrikonis</u>, 2013 U.S. Dist. LEXIS 155487, at *23-*24 ("Plaintiff admits that

he made mistakes"); <u>Verma v. Univ. of Pa.</u>, No. 11-611, 2012 U.S. Dist. LEXIS 70333, at *28

(E.D. Pa. May 18, 2012), *aff'd*, 2013 U.S. App. LEXIS 16342 (3d Cir. 2013)("The undisputed

evidence demonstrates that Plaintiff's work performance from 2006 to 2008 was negatively

reviewed by three different supervisors, and that Defendant's termination of Plaintiff was a direct

result of her continued performance and behavioral deficiencies, not discriminatory animus.");

<u>see also</u> <u>Bielich</u>, 6 F. Supp.3d at 613 ("none of [plaintiff's] arguments demonstrate such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions that would permit

a reasonable jury to disbelieve that [defendant] fired [plaintiff] due to poor performance, and

instead believe that she was fired because of her disability.").   Plaintiff's similar errors prior to

her meningitis infection in December 2008 are strong evidence that her errors in 2011 were not

caused by a residual cognitive impairment related to the infection.  <u>See</u> <u>Fuoco v. Lehigh Univ.</u>,

981 F. Supp.2d 352, 364 (E.D. Pa. Nov. 8, 2013)("[Plaintiff] does not establish how those

mistakes were linked to her ADD and merely making mistakes at work is not sufficient to

establish a causal connection to a potential disability.").

   Plaintiff points to no evidence that "poor job performance was not the actual

motivation for Plaintiff's discharge or that this reason was insufficient to warrant termination."

Petrikonis, 2013 U.S. Dist. LEXIS 155487, at *22 ("Testimony and patient records confirm that .

. . [plaintiff] continued to make mistakes with patient care, including failing to tell a patient's

physician that the patient was experiencing chest pain, repeatedly failing to document bowel

movements for multiple patients, writing illegibly on patients' charts, and improperly

administering medication."); see also Baker v. United Def. Indus., 403 F. App'x 751, 756 (3d

Cir. 2010)(not precedential)("Merely questioning the wisdom of an employer's decision is not

tantamount to impeaching its legitimacy.").  Ms. Anderson fails to point to any reason in the

record to show that LVH's proffered reason for terminating her employment is "so plainly wrong

that [it] cannot have been [their] real reason" or that an invidious discriminatory purpose was

more likely than not a motivating cause of LVH's actions.  She does not show that her recurrent

performance issues, several significant patient safety errors and LVH's progressive discipline of

her over the course of 2011 had no basis in fact, did not actually motivate her termination or that

they were insufficient to motivate her termination.  Thus, Ms. Anderson fails to satisfy her

burden under the third step of the McDonnell Douglas framework and summary judgment in

favor of LVH is appropriate on Ms. Anderson's claims for discriminatory discharge under the

ADA and the PHRA.

      **B.**    **Failure to Provide Reasonable Accommodation.[5]**

      Ms. Anderson also asserts claims in Counts I and III of her Amended Complaint

---

[5]    The PHRA also imposes a duty to reasonably accommodate and therefore the analysis of reasonable accommodation is identical under the ADA and PHRA.  Fortes v. Boyertown Area Sch. Dist., No. 12-6063, 2014 U.S. Dist. LEXIS 98867, at *36 n.46 (E.D. Pa. July 18, 2014)(citing Majtan v. Weck, No. 99-718, 2000 U.S. Dist. LEXIS 13817, at *15 n.5 (E.D. Pa. Sept. 22, 2000)).

for failure to provide reasonable accommodation.  First, this Court notes that Ms. Anderson may

not pursue a cause of action for failure to accommodate based upon allegations that she was

"regarded as" having a disability by LVH.  Perdick v. City of Allentown, 2013 U.S. Dist. LEXIS

90388, at *10-*11 (E.D. Pa. Jun. 27, 2013)(citing Kiniropoulos v. Northampton Cnty. Child

Welfare Serv., 917 F. Supp.2d. 377 (E.D. Pa. 2013) (noting that, "as  part of the amendments to

the ADA, claims based on a failure to accommodate can only be brought as part of an actual

disability claim") (emphasis in original) and McGinley v. City of Allentown, No. 5:12-cv-645,

2012 U.S. Dist. LEXIS 188387, at *10 (E.D. Pa. June 18, 2012) (noting that actual disability is

required to proceed under a "failure to accommodate" cause of action).  As Judge Joyner noted in

Perdick, the Third Circuit came to a contrary conclusion in Williams, 380 F.3d at 775

(interpreting statute prior to ADA Amendments Act of 2008) and in Hohider v. United Parcel

Servs., Inc., 574 F.3d 169, 188 n. 17 (3d Cir. 2009)(resolving matter on other grounds).  Perdick,

2013 U.S. Dist. LEXIS 90388, at *10 n.6.  Because there is no dispute that the ADA

Amendments Act of 2008 applies in this case because the pertinent facts occurred after the Act

was amended, this Court also defers to the clear statutory text on this point.

       Next, this Court must examine Ms. Anderson's claim for failure to provide

reasonable accommodation based on her assertion of actual disability.   Under the ADA,

employers are required to provide "a reasonable accommodation to the known physical or mental

limitations of an otherwise qualified individual with a disability unless such covered entity can

demonstrate that the accommodation would impose an undue hardship on the operation of the

business of such covered entity."  Fortes v. Boyertown Area Sch. Dist., No. 12-6063, 2014 U.S.

Dist. LEXIS 98867, at *35-*36 (E.D. Pa. July 18, 2014)(quoting 42 U.S.C. § 12112(b)(5)(A).

LVH moves for summary judgment of the failure to provide reasonable accommodation claims.  As LVH notes, the ADA provides, in relevant part, that the term "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).   Reasonable accommodation "includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith, under what has been termed a duty to engage in the interactive process." Stadtmiller v. UPMC Health Plan, Inc., 491 F. App'x 334, 336 (3d Cir. 2012)(not precedential)(quoting Williams, 380 F.3d at 761 (internal citation and quotation marks omitted)). To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 319-320 (3d Cir. 1999)(citations omitted).

Plaintiff disavowed at her deposition the allegation in her Amended Complaint that she was terminated from her position with Defendant because of any request for an accommodation. Pl. Dep. 271:3-21.  Plaintiff also testified at her deposition that she did not make any complaint of disability discrimination to Human Resources or management prior to the termination of her employment. Pl. Dep. 272:3-20; 273:6-276:2.  Nonetheless, given the facts of

28

record, and taking Plaintiff's deposition testimony regarding her request for "help," as true, there is no genuine issue of material fact for trial which suggests that LVH did not make a good faith effort to assist Plaintiff in seeking accommodations.

        LVH sought additional information on multiple occasions over the course of many months to determine whether Ms. Anderson might have a condition which was impacting her work performance.  LVH had Plaintiff evaluated by Employee Health Services, sought feedback from Plaintiff's primary care physician on multiple occasions (although no response was received until one month after her termination) and reviewed a Neurobehavioral Assessment Report by Dr. David Glosser, who evaluated Plaintiff at the request of her primary care physician.  Neither Employee Health Services nor Dr. Glosser diagnosed Plaintiff with any condition.  Dr. Glosser's Report identified no specific reasonable accommodations which would have enabled Plaintiff to perform the essential functions of her job, "suggest[ing that] [Plaintiff] could return to office nursing though she would probably be more comfortable if she did not have to handle multiple simultaneous tasks."  Plaintiff's duties were reduced while LVH sought additional information from Plaintiff's primary care physician.  After following up several times over a period of many months with Plaintiff's primary care physician to no avail, the neurobehavioral assessment remained the only medical evidence available to LVH.

        In the face of silence from Plaintiff's primary care physician and in order to learn more about Plaintiff's condition and potential accommodations, LVH held a meeting with Plaintiff, asking her about her condition, limitations and requested accommodations.  According to Plaintiff, she never requested a specific reasonable accommodation, only asking for "help."  In the face of a non-diagnosed "condition," attempts to gather information from multiple sources

and a conversation with Plaintiff asking her what might enable her to perform the essential

functions of her job, Plaintiff and her primary care physician provided no information to assist

LVH to assess how it might "help" her.

   After Plaintiff's June 2011 error, which risked the safety of a patient, Plaintiff's

duties were temporarily reduced while LVH sought additional information from Plaintiff's

physician.  Even while performing reduced duties, Plaintiff failed to inform a doctor in a timely

manner of a patient's critical lab value resulting in a "serious near miss event."  As a result, on

November 9, 2011, Plaintiff was placed on leave with pay pending the receipt of additional

information from Plaintiff's primary care physician.  During the five month period of time from

June 2011 through November 2011, Plaintiff had medical appointments at her primary care

physician's office seven (7) times, including on November 29, 2011 during her leave of absence

following her November 9, 2011 "serious near miss event."  Despite these appointments, as well

as LVH's multiple requests for information, no information was provided to LVH until one (1)

month after Plaintiff's termination.  Plaintiff contends that her primary care physician, Dr. Gopal,

was out of the country at some point in the Fall of 2011, although she does not know when Dr.

Gopal left or returned to the United States.

   Plaintiff contends that the following passage from a November 18, 2014 email to

Eggen, Jones and Straubinger by Carol Guanowsky evidences that LVH had no intention of good

faith engagement in the interactive process and that it was "simply weary of working with

Plaintiff":

     Our physician's interpretation of the testing is that she does have
     some significant deficits. Since our physician has not received the

> requested feedback from Gwen's physician, she has sent a letter to
> her physician (who ordered and received the results of the testing)
> communicate any suggested accomodations [sic] or restrictions, in
> addition to the avoidance of multitasking, that would allow her to
> function safely. At this point, I would suggest the ADA meeting be
> set up with Gwen and the ADA form completed. (Chuck does this).
> Gwen can express any accomodations [sic] that she feels she needs
> and the interactive discussion can occur regarding reasonableness
> and the plan of implementing them. If her doctor provides
> additional suggestions, we can bring them to your attention. If there
> are accomodations [sic] that can be made, Gwen can resume work
> with these in place. If there are still issues, progressive disciplinary
> action can continue, as we have made every effort to accommodate
> and she could not perform the duties even with accommodation
> [sic]. If her accomodation [sic] requests are not reasonable (by
> ADA standards), it seems clear that from your perspective she is
> unable to perform the job.

Guanowsky 11/18/11 Email (Dep. Exh. Straubinger 17).   Despite Plaintiff's characterization, this email actually memorializes LVH's participation in the interactive process, and the steps it took to determine what, if any, accommodations could be made to support Plaintiff in performing her position.   The record shows that Plaintiff's own actions or omissions during the interactive process caused a breakdown in the interactive dialogue.   LVH did not breach its duty to engage in the interactive process and Ms. Anderson fails to establish that the accommodations she requested, i.e., help, even if reasonable and feasible, would have rendered her qualified to perform her job duties.   Ms. Anderson fails to establish that LVH did not make a good faith effort to assist her in seeking accommodations.   Thus, summary judgment is granted to LVH on Plaintiff's claim for failure to provide reasonable accommodation under the ADA and the PHRA.

## V.   <u>CONCLUSION.</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.   An appropriate Order follows.